**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | **:** | |
| ASBESTOS WORKERS LOCAL 24 | **:** | |
| PENSION FUND, et al. | **:** | |
| | **:** | |
| v. | **:** | |
| | **:** | Civil Action No. CCB-10-918 |
| NLG INSULATION, INC. | **:** | |
| | **:** | |

...o0o...

## MEMORANDUM

Pending before this court is a motion for summary judgment filed by the plaintiffs,

Asbestos Workers Local 24 Pension Fund (the "Fund") and the trustees of the Fund, Lino

Cressotti, Brian Cavey, Dave Nichols, W. Paul Stonebreaker, Rick Pumphrey and Dave Trumble

(collectively, the "trustees"). The plaintiffs have sued NLG Insulation, Inc. ("NLG") under the

Employee Retirement Income Security Act of 1974 ("ERISA") to collect withdrawal liability,

interest, liquidated damages, attorneys' fees and costs. The issues in this case have been fully

briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2010). For the reasons

stated below, the plaintiffs' motion for summary judgment will be granted and judgment will be

entered for the plaintiffs.

## BACKGROUND

This case arises out of a collective bargaining agreement, called a Joint Trade Agreement

(JTA), between the Heat & Frost Insulators & Allied Workers Local 24 ("Local 24") and

Gamble Insulation Company, Inc. ("Gamble Insulation").[1] Gamble Insulation was a signatory to

the JTA executed in 2000. (Pls.' Ex. A.) Anthony Gamble, the former president of Gamble

---

[1] In full, the JTA is entitled "Joint Trade Agreement with International Association of Heat and Frost Insulators and Asbestos Workers Local #24 Baltimore-Washington and Insulation Contractors' Association of Washington, D.C., Inc. and Vicinity and All Contractors who Become Signatory to this Agreement." (Pls.' Ex. A.)

Insulation and current president of NLG, executed the JTA on behalf of Gamble Insulation.

(*Id.*)[2]  As a signatory, Gamble Insulation was obligated to pay pension contributions to the

Asbestos Workers Local 24 Pension Fund ("the Fund") on behalf of its covered employees for

work in all jurisdictions covered by the JTA.  (Pls.' Ex. A, Art. X(B); Affidavit of Renee Parenti

("Parenti Aff.") ¶¶ 3-4, Pls.' Ex. I.)  The Fund is administered at 7130 Columbia Gateway Drive,

Columbia, MD 21046.  (Compl. ¶4.)

> The 2000 JTA provided:
>
> This Agreement shall remain in full force and effective from October 1, 2000, until
> September 30, 2003, and *shall be automatically renewed* for the term of one (1) year and
> so on from pay raise to pay raise thereafter, *until either party shall give notice in writing*
> to the other party ninety (90) days prior to any expiration date of intention to terminate
> the Agreement or to request changes in the terms and conditions thereof.

(Pls.' Ex. A, Art. XXV (emphasis added).)  The 2000 JTA expired on September 30, 2003.

(Pls.' Ex. A.)  At no time did Gamble Insulation provide written notification of its intent to

withdraw from the 2000 JTA.  (Affidavit of Lino Cressotti (Cressotti Aff.) ¶6, Pls.' Ex. G;

Parenti Aff. ¶4.)  Mr. Gamble, the president of NLG and the former president of Gamble

Insulation, avers that "contrary to the Plaintiffs' allegations that the Trade Agreement renewed

itself for one (1) year periods, Gamble Insulation Co., Inc. refused to execute Trade Agreements

after the year 2003, though same had been submitted for execution."  (Affidavit of Tony Gamble

("Gamble Aff.") ¶2, Def.'s Ex. 3.)  "[I]t was made known to the Plaintiffs," Gamble avers, "that

Gamble Insulation Co., Inc. would not participate in the Union in or about the year 2003 . . . in

communications between said parties during the time the prior litigation was pending."  (*Id*. ¶2.)

Mr. Gamble does not, however, claim that any written notification was provided to withdraw

from the JTA.

---

[2] In an earlier litigation before a different judge of this court, Mr. Gamble apparently disputed that he signed the
2000 JTA.  *See Trustees of the National Asbestos Workers Medical Fund v. Gamble Insulation Co., Inc.*, No. 04-
291-WDQ (D. Md. Jan. 4, 2006).  Here, there is no dispute that Gamble Insulation was a signatory to the JTA.

In 2004, the trustees of the Fund, along with the trustees of the National Asbestos Workers Medical Fund, sued Gamble Insulation to collect pension contributions owed under the 2000 JTA for certain months between January 2001 and December 2003.  *See* Complaint, *Trustees of The National Asbestos Workers Medical Fund v. Gamble Insulation Co., Inc.*, No. 04-291-WDQ (D. Md. Feb. 3, 2004), ECF No. 1 ¶30.  In January 2005, the plaintiffs amended their complaint, adding Mr. Gamble as a defendant and extending the period of contributions demanded to "the present."  *See* Amended Complaint, *Trustees v. Gamble Insulation*, No. 04-291-WDQ (D. Md. Jan. 18, 2005), ECF No. 36 ¶¶6, 15.)  In January 2006, Judge Quarles granted the plaintiffs' motion for summary judgment, ordering that Gamble Insulation and Mr. Gamble pay delinquent contributions owed through March 2005, plus interest, audit costs and attorney's fees and costs.  *Trustees v. Gamble Insulation*, No. 04-291-WDQ (D. Md. Jan. 4, 2006), ECF No. 68.

Gamble Insulation ceased doing business in 2006.  (Deposition of Anthony Gamble, Aug. 13, 2008 ("Gamble Dep."), Pls.' Ex. H, at 13:12-15:8,  22:11-19.)  On March 11, 2008, Gamble Insulation filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Maryland.  *See* In re *Gamble Insulation Co., Inc*., No. 08-13362 (Bankr. Md. Mar. 11, 2008).  This bankruptcy proceeding appears to be currently pending.

In 2009, the trustees determined that Gamble Insulation had withdrawn from the Fund in April 2006, which, it contended, was the date when Gamble Insulation ceased operations and thereby ceased being obligated to contribute to the Fund.  (Letter from Paul Green to Stanley Alpert (Nov. 3, 2009) ("Review letter"), Pls.' Ex. D, at 2-3.)  On September 18, 2009, the Fund sent an assessment of withdrawal liability to NLG, advising NLG that it owed withdrawal liability to the Fund in the amount of $24,165, based on the withdrawal date of April 2006.

(Letter from Reneé Parenti to Anthony Gamble (Sept. 18, 2009) ("Demand letter"), Pls.' Ex. B.)
The letter was addressed to "Mr. Anthony Gamble[,] NLG Insulation, Inc." (*id.*) and assessed
withdrawal liability in the amount of $24,165, which, if paid in monthly installments under the
trustees' proposed payment schedule, would total $26,528. (Pls.' Ex. B.) The trustees arrived at
that calculation based on their determination that NLG and Gamble Insulation withdrew from the
Fund in April 2006. (Review letter, Pls.' Ex. D, at 2-3.) It determined that withdrawal occurred
in 2006 because Mr. Gamble testified during the 2008 bankruptcy proceedings that Gamble
Insulation ceased operations that year. (*Id.* at 3.)

On October 27, 2009, NLG Insulation, through counsel, requested a review of the
withdrawal liability assessment. (Letter from Stanley Albert to Local 24 Pension Fund Board of
Trustees (Oct. 27, 2009), Pls.' Ex. C.) The Fund reviewed NLG's request and responded in
detail through counsel in a letter dated November 3, 2009. (*See* Review letter, Pls.' Ex. D.) In
the letter, the trustees declined to withdraw or modify the withdrawal liability assessment. (*Id.*)

The plaintiffs brought the instant action on April 14, 2010 to collect withdrawal liability
amounts owed, accrued interest, liquidated damages and attorneys' fees.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment
if the movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified
that this does not mean that any factual dispute will defeat the motion. "By its very terms, this
standard provides that the mere existence of *some* alleged factual dispute between the parties will
not defeat an otherwise properly supported motion for summary judgment; the requirement is
that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247-48 (1986) (emphasis in original).  Whether a fact is material depends upon the substantive law.  *See id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'"  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

## ANALYSIS

When Congress enacted ERISA in 1974, among its "principal objectives" was "the development of a system that would guarantee that promised benefits be paid to those workers who had met the conditions required to attain a 'vested' status within the terms of the plan."  *Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 529 (4th Cir. 1992).  "By 1980, however, it became clear to Congress that ERISA's scheme for multiemployer plans contained some structural defects which threatened the plans' ability to maintain and ensure funding of vested benefits."  *Id.* (citing *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722 n. 2 (1984)).  In response, Congress enacted the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), Pub. L. No. 96-364, 94 Stat. 1208 (1980).  Under the MPPAA, "Every employer who is obligated to make contributions to a

multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. When an employer withdraws from a multiemployer pension plan, the employer incurs "withdrawal liability." *See* 29 U.S.C. § 1381 (imposing withdrawal liability); *id.* § 1391 (establishing methods for computing withdrawal liability). Withdrawal liability is "intended to cover that employer's share of the unfunded vested benefits in existence at the time of withdrawal." *Bordon, Inc.*, 974 F.2d at 529-30.

Withdrawal may take either of two forms: partial withdrawal or complete withdrawal. 29 U.S.C. § 1381(a). Complete withdrawal, the form at issue here, occurs "when the employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." *Id*. § 1383(a). Upon an employer's withdrawal, the plan sponsor is responsible for assessing withdrawal liability in accordance with one of the methods described in the statute. *See* 29 U.S.C. § 1391. The MPPAA imposes withdrawal liability not only on withdrawing employers, but also on any other entities that, along with the withdrawing employer, are considered a "single employer." Two or more "trades or businesses (whether or not incorporated)" are considered a "single employer" when those entities are "under common control" at the time of the withdrawal. 29 U.S.C. § 1301(b)(1). Multiple entities that are "single employers" are jointly and severably liable for withdrawal liability. *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 121 (4th Cir. 1991).

Multiemployer pension plans are entitled to sue employers to enforce the contribution obligations required by controlling agreements. *Bakery & Confectionery Union & Indus. Int'l Pension v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997). They may collect unpaid

contributions, interest, liquidated damages up to 20 percent of the unpaid contributions, attorneys' fees and costs, and "other legal or equitable relief as the court deems appropriate." 29 U.S.C. § 1132(g)(2). They are also empowered to sue employers to collect withdrawal liability, 29 U.S.C. § 1451(a)(1), which the Fund and its trustees have done here.

The parties do not dispute that the Fund is an employee pension benefit plan within the meaning of Section 3(2), (3) of ERISA, 29 U.S.C. § 1002(2), (3), and a multiemployer plan within the meaning of Section 3(37)(A) of ERISA, 29 U.S.C. § 1002(37)(A). They also do not dispute that Gamble Insulation was a signatory to the 2000 JTA and thus was obligated to make pension contributions under the agreement. The parties disagree, however, on two principal issues. First, NLG contends it is not liable for pension contributions under the JTA because it was not a signatory to the agreement, did not employ members of Local 24, and was created after Gamble Insulation withdrew from the fund and thus cannot have been a "single employer" with Gamble Insulation at the time of withdrawal. Second, NLG contends that the Fund and its trustees miscalculated the amount of its liability because Gamble Insulation withdrew from the Fund in 2003, not in 2006.

## I.     Arbitrability of the "employer" determination

Before reaching the merits of those two factual disputes, however, there is a threshold question: whether NLG, by failing to initiate arbitration proceedings, forfeited its right to contest the Fund's withdrawal liability assessment. When disputes arise "between an employer and the plan sponsor of a multiemployer plan" concerning withdrawal liability, those disputes must be "resolved through arbitration." *Id.* § 1401(a)(1); *see also Bd. of Trs. v. BES Servs.,* 469 F.3d 369, 374 (4th Cir. 2006) ("[T]he arbitration process prescribed by the MPPAA is a significant part of Congress'[s] efforts to shore up the financial stability of multiemployer pension plans."). Either

party may initiate arbitration within sixty days of the earlier of (a) the date the employer was notified of the plan sponsor's decision regarding the employer's request for review, or (b) 120 days after the date of the employer's request for review. 29 U.S.C. § 1401(a)(1).[3] If an employer fails to initiate arbitration proceedings, "the amounts demanded by the plan sponsor . . . *shall be due and owing* on the schedule set forth by the plan sponsor." 29 U.S.C. § 1401(b)(1) (emphasis added). Thus if an employer is assessed withdrawal liability and fails to initiate arbitration proceedings within the prescribed deadlines, it forfeits objections to aspects of the liability assessment that are arbitrable.

Several courts have held, however, that when a dispute involves the question of whether a company was ever an "employer" for purposes of the MPPAA, the company does not forfeit its right to challenge that determination by failing to initiate arbitration proceedings. As the Second Circuit has explained, "the MPPAA prescribes arbitration only for disputes 'between an *employer* and the plan sponsor.'" *New York State Teamsters Conference Pension and Retirement Fund v. Express Services, Inc.*, 426 F.3d 640, 645 (2d Cir. 2005) (quoting 29 U.S.C. § 1401(a)(1)) (emphasis in original). Accordingly, "employer status is a 'threshold legal issue' requiring 'judicial resolution,' since an entity that is not an employer cannot, under the MPPAA, be required to arbitrate." *Id.* (quoting *Bowers v. Transportación Marítima Mexicana, S.A.*, 901 F.2d 258, 261 (2d Cir. 1990)); *accord Galgay v. Beaverbrook Coal Co.*, 105 F.3d 137, 141 (3d

<hr />

[3] Under ERISA, when an employer partially or completely withdraws from a plan, the plan sponsor is obligated, "[a]s soon as [is] practicable," to notify the employer of the amount of liability and the schedule of liability payments, and to demand payment in accordance with the schedule. 29 U.S.C. § 1399(b)(1). Within thirty days of such a demand, the employer must "furnish such information as the plan sponsor reasonably determines to be necessary to enable the plan sponsor to comply with [its duties under the withdrawal provisions of ERISA]." *Id.* § 1399(a). Within ninety days of receiving the demand, the employer "(i) may ask the plan sponsor to review any specific matter relating to the determination of the employer's liability and the schedule of payments, (ii) may identify any inaccuracy in the determination of the amount of the unfunded vested benefits allocable to the employer, and (iii) may furnish any additional relevant information to the plan sponsor." *Id.* § 1399(b)(2)(A). After receiving such requests and making a final determination on the employer's withdrawal liability, the plan sponsor must notify the employer of "(i) the plan sponsor's decision, (ii) the basis for the decision, and (iii) the reason for any change in the determination of the employer's liability or schedule of liability payments." *Id.* § 1399(b)(2)(B).

Cir. 1997); *Rheem Mfg. Co. v. Cent. States Southeast & Southwest Areas Pension Fund*, 63 F.3d 703, 705-06 & n.3 (8th Cir. 1995); *Banner Indus., Inc. v. Cent. States, Southeast & Southwest Areas Pension Fund*, 875 F.2d 1285, 1293 (7th Cir. 1989); *Mason & Dixon Tank Lines, Inc. v. Cent. States, Southeast & Southwest Areas Pension Fund*, 852 F.2d 156, 167 (6th Cir. 1988); *see also Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1247-51 (3d Cir. 1987) (concluding that "where the party against which withdrawal liability is being assessed was certainly part of the controlled group of an employer subject to MPPAA at some point in time, . . . the Act's [arbitration] procedures must be followed").

The Fourth Circuit has not squarely addressed whether a company that argues it was never an "employer" for MPPAA purposes forfeits its right to challenge a withdrawal liability assessment by failing to initiate arbitration. In *Teamsters Joint Council*, 947 F.2d at 122-23, however, it cited with approval the Third and Seventh Circuits' cases, *Flying Tiger Line*, 830 F.2d at 1247-51, and *Banner Industries*, 875 F.2d at 1292, which adopted the distinction, discussed above, between whether "one remains an employer on the date of withdrawal," which is "an issue for the arbitrator," and whether "one ever became an 'employer,'" which is "an issue for the court since its resolution determines the arbitrator's authority over the dispute." *Flying Tiger Line*, 830 F.2d at 1250; *see also Banner Industries*, 875 F.2d at 1293. In *Teamsters Joint Council*, the court explained that "as long as a withdrawing entity was a part of the control group of an employer subject to the MPPAA *at some point in time*, and where the issues in dispute fall under provisions explicitly designated for arbitration, the [MPPAA's] arbitration procedure must be followed." 947 F.2d at 123 (emphasis in original). Nonetheless, the court explained, there are some "rare case[s]" in which "the employer claims that it did not *become* an employer for MPPAA purposes in time to acquire withdrawal liability, or where the employer asserts that it

was *never* an MPPAA employer and thus is not subject to ERISA's dispute resolution procedures." *Id.* at 122 (emphasis in original). In those cases, "federal courts have intervened to take jurisdiction prior to arbitration." *Id*.

As cases like *New York State Teamsters* and *Flying Tiger Line* have explained, the MPPAA mandates arbitration "between an employer and the plan sponsor." 29 U.S.C. § 1401(a)(1). If an entity is an employer, then the MPPAA requires that disputes between it and a pension fund be resolved through arbitration. If an entity was never an employer for MPPAA purposes, then it is neither subject to withdrawal liability nor obligated to submit to arbitration. Accordingly, where an entity claims in good faith that it "did not *become* an employer for MPPAA purposes in time to acquire withdrawal liability" or that it "was *never* an MPPAA employer and thus is not subject to ERISA's dispute resolution procedures," *Teamsters Joint Council*, 947 F.2d at 122, the entity does not forfeit its right to challenge its withdrawal liability by failing to initiate arbitration proceedings. In other words, "employer status is a threshold legal issue requiring judicial resolution." *New York State Teamsters*, 426 F.3d at 645 (citation and internal quotation marks omitted).

This conclusion is particularly important given the MPPAA's requirement that an employer make interim payments on its withdrawal liability even when it initiates arbitration proceedings in order to challenge its withdrawal liability. 29 U.S.C. §§ 1399(c)(2), 1401(d). The MPPAA "unambiguously established a 'pay now, dispute later' dispute resolution procedure designed to protect the financial stability of multi-employer pension plans from unnecessary risk caused by protracted delay in the collection of withdrawal liability payments." *Teamsters Joint Council*, 947 F.2d at 119. "[C]ourts have allowed an exception to the statutory directive only where an employer makes a facial constitutional attack or shows that irreparable injury will

result from being forced to make the interim payments. The burden of qualifying for this exception, however, is extremely high." *Id.* at 120 (citations omitted). If arbitration were mandatory on the issue of whether an entity was ever an "employer," an entity that was never an "employer" under the MPPAA but nonetheless was assessed withdrawal liability by a pension fund would face not only the burden of the costs of arbitration, but also the cost of making interim withdrawal payments.

The facts here present one of those "rare case[s]" in which "the employer asserts that it was *never* an MPPAA employer and thus is not subject to ERISA's dispute resolution procedures." *Id.* (emphasis in original). Unlike in *Teamsters Joint Council*, where the defendant entity conceded that it had been an employer for MPPAA purposes for at least some period of time, *id.* at 120, NLG contends that Gamble Insulation withdrew from the Fund before NLG existed, and therefore NLG was never an "employer" for purposes of withdrawal liability.[4] Accordingly, it argues, it was never obligated to arbitrate and thus did not forfeit its right to challenge the Fund's determination that it was a "single employer" along with Gamble Insurance at the time of withdrawal.

The court recognizes that this conclusion renders it necessary for the court to decide two issues—(1) the date on which Gamble Insulation withdrew from the Fund and (2) whether, on that date, Gamble Insulation and NLG were under "common control"—that involve the type of factual determinations that generally must be arbitrated. *Cf. Flying Tiger*, 830 F.2d at 1252 (noting that the arbitration requirement allows an arbitrator "to perform functions within its special competence: to create a factual record, to apply its expertise, and to correct its own errors

---

[4] *Teamsters Joint Council* is also distinguishable for another reason: Centra, unlike NLG, had initiated arbitration procedures within the deadline prescribed by the MPPAA. 947 F.2d at 118. Therefore, the case did not address the issue of when an entity forfeits the right to contest particular issues by failing to initiate arbitration. Rather, the issue was whether the company was liable for making interim withdrawal liability payments during the course of arbitration.

so as to eliminate potential controversies that would otherwise end up in federal court."); *I.A.M. Nat'l Pension Fund v. Clinton Engines Corp.*, 825 F.2d 415, 422 (D.C. Cir. 1987) ("Congress presumably determined that a substantial portion of disputes could be promptly and efficiently resolved through informal procedures. . . . And even as to those disputes which could not be finally resolved outside the judicial system, a broad arbitration requirement—coupled with statutorily mandated deference to the arbitrator's factual findings, 29 U.S.C. § 1401(c)—would encourage the orderly development of the law in a forum other than the generalist judiciary, ultimately providing reviewing courts with better framed legal arguments.").  Nonetheless, because the "employer" determination is a "'threshold legal issue' requiring 'judicial resolution,'" *New York State Teamsters*, 426 F.3d at 645, and because on the facts presented, deciding that question requires deciding when withdrawal occurred and whether the two companies were under common control, those questions will be resolved here.

For these reasons, despite NLG's failure to initiate arbitration proceedings, it did not forfeit its right to challenge the Fund's determination that NLG and Gamble Insulation were a "single employer" at the time of withdrawal.  Because it contends that it was never an "employer" under the MPPAA, the withdrawal liability assessed by the Fund did not become "due and owing," 29 U.S.C. § 1401(b)(1), when the deadline for arbitration passed. Accordingly, the court will proceed to the merits of the Fund's claim that NLG and Gamble Insulation were a "single employer" at the time of withdrawal.

## II.     Gamble Insulation and NLG as a "single employer"

As stated above, whenever two or more "trades or businesses (whether or not incorporated) . . . are under common control" at the time of withdrawal, they are considered a "single employer" and are jointly and severably liable for withdrawal liability.  *See* 29 U.S.C.A.

§ 1301(b)(1); *Teamsters Joint Council*, 947 F.2d at 121 ("As long as Centra was a control group member with M & D when M & D withdrew from the Pension Fund, Centra is jointly and severally liable on the withdrawal obligation.").  Gamble Insulation was a signatory to the 2000 joint trade agreement and employed workers represented by Local 24.  The Fund alleges that at the time Gamble Insulation withdrew from its obligations under the JTA, it and NLG were under "common control."  Accordingly, the Fund argues, the two companies were a "single employer" for purposes of the MPPAA and thus are jointly and severably liable for the assessed withdrawal liability.  As discussed above, to determine NLG's withdrawal liability requires determining (1) the date on which Gamble Insulation withdrew from the Fund and (2) whether, on that date, Gamble Insulation and NLG were under "common control."

## A. *The date of withdrawal*

An employer completely withdraws from a pension fund when it "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan."  29 U.S.C. § 1383(a).  Under the 2000 JTA, an employer remained obligated to contribute under the plan until the time it "[gave] notice in writing" ninety days prior to the expiration of the agreement.  (Pls.' Ex. A, Art. XXV.)  In the absence of such written notification of withdrawal, the agreement was "automatically renewed for the term of one (1) year and so on from pay raise to pay raise thereafter."  (*Id.*)  Here, there is no dispute that Gamble Insulation did not notify the Fund in writing of its intent to terminate its participation.  While Mr. Gamble states that Gamble Insulation "refused to execute" new JTAs after 2003 and that the plaintiffs knew "that Gamble Insulation Co., Inc. would not participate in the Union in or about the year 2003" (Gamble Aff. ¶¶ 2-3), he does not claim that he, Gamble Insulation or NLG provided written notification to withdraw from the JTA.  Gamble Insulation thus continued to be

obligated to pay pension contributions to the Fund after the JTA expired in 2003. Therefore, the date of Gamble Insulation's complete withdrawal is the date on which it "permanently cease[d] all covered operations under the plan." *See* 29 U.S.C. § 1383(a).

When the Fund assessed $24,165 in withdrawal liability, it determined that NLG "permanently cease[d] all covered operations under the plan" in April 2006. (Review letter, Pls.' Ex. D, at 2-3.) It determined that withdrawal occurred in 2006 because Mr. Gamble testified during the 2008 bankruptcy proceedings that Gamble Insulation ceased operations that year. (*Id.* at 3.) NLG contests the date of withdrawal, arguing that Gamble Insulation had "no intent to remain a member of the Union as of the year 2003 and certainly not subsequent to March of 2005." (Def.'s Mem. at 2.) There is no evidence, however, that Gamble Insulation permanently ceased covered operations in 2003 or 2005. Indeed, Mr. Gamble admitted during his 2008 deposition that Gamble Insulation continued to operate until 2006. (Gamble Dep., Pls.' Ex. H, at 13:14, 14:3-11, 20:1, 22:11-19.) Moreover, Lino Cressotti, the business manager of Local 24, avers that in 2006 when Gamble Insulation was in operation, it employed workers who were represented by Local 24. (Cressotti Aff., Pls.' Ex. G, ¶ 3.) NLG does not provide any evidence to controvert this fact. The only evidence in the record concerning the date when Gamble Insulation "permanently cease[d] all covered operations" supports the Fund's determination that Gamble Insulation withdrew from the Fund in 2006.

The question remains, however, as to when in 2006 withdrawal occurred. The Fund determined that withdrawal occurred in April 2006. (Review letter, Pls.' Ex. D, at 3.) It is unclear from the record how the Fund reached the April 2006 date.[5] Nonetheless, given Mr.

---

[5] The trustees apparently described their methodology for reaching the April 2006 date in an exhibit to their September 18, 2009 notice and demand letter. (*See* Parenti letter, Pls.' Ex. B, at 3 ("Attached as Exhibit 2 is a description of how your withdrawal liability and payment schedule were calculated.").) The plaintiffs did not include that exhibit in its submissions in support of its motion for summary judgment.

Gamble's testimony that Gamble Insulation continued operating until late fall of 2006,[6] there is

no genuine issue of material fact that Gamble Insulation was obligated to contribute to the Fund

at least through April 2006.  For these reasons, for the purposes of this motion for summary

judgment, there is no genuine issue of material fact that withdrawal occurred in April 2006.

### B.  *Common control*

Having determined that there is no genuine issue of material fact that withdrawal

occurred in April 2006, and because NLG does not dispute that it and Gamble Insulation are

"trades or businesses" within the meaning of 29 U.S.C. § 1301(b)(1), the question of NLG's

liability turns on whether Gamble Insulation and NLG were under "common control" at the time

of withdrawal.  The MPPAA does not define "common control."  Rather, it delegates to the

Pension Benefit Guaranty Corporation (PBGC) the authority to promulgate regulations defining

the term.  *See* 29 U.S.C. § 1302(b)(3) (authorizing the PBGC "to adopt, amend, and repeal, by

the board of directors, bylaws, rules, and regulations relating to the conduct of its business and

the exercise of all other rights and powers granted to it by this chapter"); *id.* § 1301(b)(1)

(referring to "regulations prescribed by the [PBGC]" concerning the "common control"

provision).  In delegating that authority, Congress instructed that PBGC regulations interpreting

the meaning of "common control" under § 1301 must be "consistent and coextensive with

regulations prescribed for similar purposes by the Secretary of the Treasury under section 414(c)

of Title 26."  29 U.S.C. § 1301(b)(1); *see also* 26 U.S.C. § 414(c) (providing, like 29 U.S.C. §

---

[6] The relevant exchange was the following:
   Q.  And I think you just stated shortly before that Gamble continued to operate until 2006; is that correct?
   A.  Yes.
   Q.  At what point in 2006 did Gamble stop operating, actually conducting business?
   A.  Probably in the fall of 2006.
   Q.  Late fall?
   A.  Mm-hmm.
(Gamble Dep. at 22:11-19.)

1301(b)(1), that "all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer.").

Pursuant to that authority, the PBGC has expressly adopted the regulations issued by the Secretary of the Treasury under 26 U.S.C. § 414(c).  *See* 29 C.F.R. § 4001.3 ("The PBGC will determine that trades and businesses (whether or not incorporated) are under common control if they are 'two or more trades or businesses under common control', as defined in regulations prescribed under section 414(c) of the [Internal Revenue] Code.").  Those regulations, in turn, define one type of "single employer" as a "brother-sister group of trades or businesses under common control."  26 C.F.R. § 1.414(c)-2(c)(1).  These are two or more businesses where "(i) the same five or fewer persons . . . own . . . a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization."  *Id.*[7]  A "controlling interest" in a corporation is defined as "ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation."  *Id.* § 1.414(c)-2(b)(2)(i)(A).  "Effective control" of a corporation is defined as ownership of stock "possessing more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of such corporation."  *Id.* § 1.414(c)-2(c)(2)(i); *see Local 478 Trucking & Allied Indus. Pension Fund v. Jayne*, 778 F. Supp. 1289, 1303 (D.N.J. 1991) ("Although the tests for controlling interest and effective control overlap, the former goes to the issue of a controlling

---

[7] NLG does not challenge the validity of 29 C.F.R. § 4001.3 or 26 C.F.R. §1.414(c)-2(c)(1).  *See Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232, 239 (2004) ("[W]henever Congress has 'explicitly left a gap for the agency to fill,' the agency's regulation is 'given controlling weight unless [it is] arbitrary, capricious, or manifestly contrary to the statute.'") (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984)).  Therefore, the regulations will be deemed controlling.

*ownership* interest whereas the latter focuses on effective *voting* control.") (emphasis in original). Various courts have applied the IRS "common control" regulations to determine whether "common control" existed for purposes of the MPPAA. *See, e.g.*, *I.A.M. Nat'l Pension Fund v. TMR Realty Co., Inc.*, 431 F. Supp. 2d 1, 11-12 (D.D.C. 2006) (holding that because the same individual owned 100 percent of three companies at all relevant times, those companies were part of a "brother-sister" control group under 26 C.F.R. §1.414(c)-2(c)(1) and therefore were under "common control" within the meaning of 29 U.S.C. § 1301(b)(1)); *Pension Benefit Guaranty Corp. v. Don's Trucking Corp.*, 309 F. Supp. 2d 827, 831-32 (E.D. Va. 2004) (holding that because the same married couple owned 100 percent of two companies, the companies were part of a "brother-sister" control group); *Jayne*, 778 F. Supp. at 1303-04 (holding that because the same three individuals owned controlling interests in three companies, the companies were under common control).

Here, it is undisputed that at all relevant times, including in April 2006, Mr. Gamble was the sole owner of both Gamble Insulation and NLG. Accordingly, "the same five or fewer persons . . . own[ed] . . . a controlling interest in each organization," and "to the extent such ownership [was] identical with respect to each such organization, such persons [were] in effective control of each organization." *See* 26 C.F.R. § 1.414(c)-2(c)(1). Therefore, as of April 2006, Gamble Insulation and NLG were a "brother-sister group of trades or businesses under common control" as defined by 26 C.F.R. § 1.414(c)-2(c)(1).

Moreover, additional facts support the finding that the two companies were a "single employer" at the time of withdrawal. Mr. Gamble started NLG with a collateral-free loan from Gamble Insulation. (Gamble Dep., Pls.' Ex. H, at 16:12-17:3.) Mr. Gamble was the president of both corporations. (*Id.* at 5:2-7.) During the period of simultaneous operation, the two

companies operated out of the same office (*id*. at 20:7-9), performed the same type of work, for some of the same clients (*id*. at 10:6, 14:20-15:8, 28:8-29:17),[8] and shared certain equipment. (*Id*. at 24:13-25:10.)[9] The insulators and an office employee who worked for Gamble Insulation during 2006 simultaneously worked for NLG. (*Id*. at 20:2-4, 30:11-20.) With respect to the office employee, Mr. Gamble even expressed uncertainty about which company issued her paycheck. (*Id*. at 21:20-22:10.)

Based on the two companies' common ownership, leadership, office, clients, equipment and employees at the time Gamble Insulation ceased operating, Gamble Insulation and NLG were under "common control" at the time of withdrawal. Therefore, NLG is liable, jointly and severally with Gamble Insulation, for the contributions to the Fund for which Gamble Insulation was liable as a signatory to the 2000 JTA.

---

[8] While NLG argues that NLG and Gamble Insulation "did not service a project or customer at the same time," (Def.'s Mem. at 2) it does not dispute the fact that there are certain clients Gamble Insulation and NLG both serviced, albeit at different times.

[9] While NLG argues that the allegedly shared equipment "was not utilized by both entities" (Def.'s Mem. at 2-3), the only evidence in the record on the issue is the following testimony by Mr. Gamble:

> Q [Ms. Regan Latesta, counsel for Richard Kreman, Chapter 13 Trustee]: At the time that both companies were operating were the ladders that were owned by Gamble being used by NLG?
> [Mr. Gamble]: Yes, a little while.
> MR. OLSON: How long is a little while?
> [Mr. Gamble]: A little while.
> MR. OLSON: Can you recall months or weeks or some more definite time period?
> [Mr. Gamble]: Probably a few months I guess.
> MR. OLSON: Thank you.
> THE WITNESS: I can't be as sure of that because I lose a lot of ladders on jobs and I'm constantly buying ladders.
> [Ms. Latesta]: But there was a period of time in which the equipment from one company, from Gamble was used for NLG?
> [Mr. Gamble]: Yes.

(Gamble Dep. at 24:13-25:10.) In this testimony, Mr. Gamble admitted that there was a period of time during which ladders that were owned by Gamble were used by NLG. There is no evidence in Mr. Gamble's deposition or elsewhere that contradicts this testimony.

### III.    The amount of liability

#### A.    *Withdrawal liability*

As stated above, the Fund assessed withdrawal liability in an amount of $24,165, based on a withdrawal date of April 2006.  The MPPAA charge-determination section, § 1391, "sets forth rules for calculating a withdrawing employer's fair share of a plan's underfunding." *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 414, 417 (1995).  Section 1391 imposes withdrawal liability for an amount "that roughly matches the employer's proportionate share of the plan's unfunded vested benefits."  *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997) (citing *R.A. Gray*, 467 U.S. at 725) (quotation marks omitted).  As discussed above, there is no genuine issue that withdrawal occurred in April 2006 and that the two companies were under common control at that time.  Moreover, other than challenging the withdrawal date and the existence of common control, NLG does not dispute the calculation of $24,165 in withdrawal liability.  Accordingly, judgment will be entered for the plaintiffs in the amount of $24,165 for withdrawal liability, plus interest at the rate set by the Plan until the date of this court's judgment order.

#### B.    *Liquidated damages*

The MPPAA also imposes liability on defaulting employers for liquidated damages.  "In any action under [29 U.S.C. § 1451] to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)."  29 U.S.C. § 1451(b).  For purposes of delinquent contributions under § 1145, in addition to the unpaid contributions, interest and attorney's fees, plan fiduciaries are entitled to

"an amount equal to the greater of –(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of [the unpaid contributions]." 29 U.S.C. § 1132(g)(2)(C). The plaintiffs seek $1,282.32 in liquidated damages. That amount is within the limit provided by the Plan and, accordingly, will be awarded.

### C. Attorneys' fees

When a multiemployer plan brings an action against an employer to recover withdrawal liability, "the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney's fees, to the prevailing party." 29 U.S.C. § 1451(e). The plaintiffs seek to recover $7,260 in attorneys' fees and $370.89 in court costs. (Pls.' Mem. at 13.) This amount is reasonable, they argue, because they were charged pursuant to a retainer agreement between the Fund and its counsel, and the amount is lower than the prevailing market rate according to the Laffey Matrix prepared by the U.S. Attorney's Office for the District of Columbia, under which attorneys' fees would be calculated at $12,045. (Pls.' Reply Mem. at 9.) NLG does not dispute the fact that the plaintiffs may recover attorneys' fees, but does dispute the amount of those fees for which it should be held liable. NLG argues the requested amount is too high because (a) it is not calculated with reference to the lodestar estimate, (b) the supporting affidavit was not made with personal knowledge, and (c) it includes "nonproductive time," "excessive charges," and "improbable hours." (Def.'s Mem. at 5.)

The court has reviewed the amount requested in light of the Rules and Guidelines For Determining Attorneys' Fees in Certain Cases, Local Rules, Appendix B (2010) and the multi-factor test in *Cox v. Reliance Standard Life Ins. Co.*, 235 F. Supp. 2d 481, 485 (E.D. Va. 2002)

(citing *Barber v. Kimbrell's Inc*., 577 F. 2d 216, 226-28 (4th Cir. 1978)), and finds the amount

reasonable.  Accordingly, the plaintiffs will be awarded $7,260 in attorneys' fees.

**<u>CONCLUSION</u>**

For the foregoing reasons, the plaintiffs' motion for summary judgment will be granted.

Judgment will be entered for the plaintiffs in the amount of $24,165 for the unpaid withdrawal

liability plus interest, liquidated damages, attorneys' fees, and court costs.  A separate order

follows.


<u>Dec. 29, 2010</u>                 <u>/s/</u>                
Date                                         Catherine C. Blake
                                               United States District Judge